**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

|                           |     |                   |
|---------------------------|-----|-------------------|
| TAMIKA WILSON,            | )   |                   |
|                           | )   |                   |
|     Plaintiff, | )   |                   |
|                           | )   |                   |
|   vs.           | )   | NO. 2:14-CV-374   |
|                           | )   |                   |
| LEAR SEATING CORPORATION, | )   |                   |
|                           | )   |                   |
|     Defendant. | )   |                   |
|                           | )   |                   |

## OPINION AND ORDER

This matter is before the Court on the Defendant's Motion for
Summary Judgment, filed by Lear Seating Corporation ("Lear") on
May 5, 2016 (DE #19), and Defendant's Motion to Strike Inadmissible
Hearsay Evidence filed by Lear on July 1, 2016 (DE #29).  For the
reasons set forth below, Defendant's Motion for Summary Judgment
(DE #19) is **GRANTED,** and Defendant's Motion to Strike (DE #29) is
**GRANTED**.  Accordingly, this case is **DISMISSED** with prejudice and
the Clerk is **DIRECTED** to **CLOSE** this case.


BACKGROUND

Plaintiff Tamika Wilson ("Wilson") had been employed by Lear
from 2000 until 2013.  In January 2012, Wilson filed a complaint
of sexual harassment by a co-worker, and as a result, Lear fired

the co-worker. Wilson alleges that after the termination of this co-worker, she was subjected to severe and pervasive harassment and retaliatory conduct by her other co-workers and her supervisor. In June 2013, Wilson filed a charge of sex discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC"). Three months after filing this charge, Lear suspended Wilson for performance. Lear terminated Wilson's employment on October 28, 2013.

Wilson filed this action asserting that Lear had retaliated against her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. Lear denies that it violated Title VII, and filed the instant motion for summary judgment. This motion has been fully briefed and is ripe for adjudication. Lear also filed a motion to strike certain evidence Wilson submitted in response to Lear's summary judgment motion. Wilson did not respond to Lear's motion to strike.

DISCUSSION

Motion to Strike

Lear's motion to strike urges the Court to strike the alleged declarations of union representative Sherri Franciski ("Franciski") as inadmissible hearsay. Wilson failed to respond to this motion, which is a sufficient reason to grant it. *See generally Wojtas v. Capital Guardian Tr. Co.*, 477 F.3d 924, 926

-2-

(7th Cir. 2007) (failure to oppose an argument constitutes waiver). "It is the function of the Court, with or without a motion to strike, to carefully review the evidence and to eliminate from consideration any argument, conclusions, and assertions unsupported by the documented evidence of record offered in support of the statement." *Wajvoda v. Menard, Inc.,* No. 2:11-CV-393, 2015 WL 5773648, at *3 (N.D. Ind. Sept. 30, 2015) (citations omitted). As such, the Court will consider the merits of Lear's motion to strike.

In response to Lear's motion for summary judgment, Wilson relies on evidence that Franciski said that "there's a witch hunt after you [Wilson]. They do not want you in here." (DE #27-1 at 40.) The only evidence that Wilson cites to support this assertion is testimony from her own deposition. Because she offers Franciski's statements "to prove the truth of the matter asserted," the statements are hearsay. Fed. R. Evid. 801(c); *see Rogers v. Waukegan Pub. Sch. Dist. 60,* 924 F. Supp. 2d 940, 946 (N.D. Ill. 2013) (disregarding plaintiff's testimony as hearsay where he testified to the statement of an out-of-court declarant in an attempt to establish the truth of the matter asserted by the declarant – that a group was "out to get" plaintiff and wanted to replace him). "A party may not rely upon inadmissible hearsay to oppose a motion for summary judgment." *Gunville v. Walker*, 583

F.3d 979, 985 (7th Cir. 2009) (citations omitted).  Therefore,
Lear's motion to strike (DE #29) is **GRANTED.**


Motion for Summary Judgment

Summary judgment must be granted when "there is no genuine
dispute as to any material fact and the movant is entitled to
judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine
dispute of material fact exists when "the evidence is such that a
reasonable jury could return a verdict for the nonmoving party."
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct.
2505, 91 L. Ed. 2d 202 (1986).  Not every dispute between the
parties makes summary judgment inappropriate; "[o]nly disputes
over facts that might affect the outcome of the suit under the
governing law will properly preclude the entry of summary
judgment."  *Id.*  To determine whether a genuine dispute of material
fact exists, the Court must construe all facts in the light most
favorable to the nonmoving party and draw all reasonable inferences
in that party's favor.  *See Ogden v. Atterholt*, 606 F.3d 355, 358
(7th Cir. 2010).

A party opposing a properly supported summary judgment motion
may not rely on allegations in her own pleading but rather must
"marshal and present the court with the evidence she contends will
prove her case."  *Goodman v. Nat'l Sec. Agency, Inc.,* 621 F.3d
651, 654 (7th Cir. 2010).  "[I]nferences relying on mere

-4-

speculation or conjecture will not suffice." *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009) (citation omitted). If the nonmoving party fails to establish the existence of an essential element on which she bears the burden of proof at trial, summary judgment is proper. *See Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006).

Facts

In August 2000, Lear hired Wilson to work at Lear's facility in Hammond, Indiana, where she assisted in assembling vehicle seats. Wilson was represented by UAW and its Local 2335 ("Union"). The Hammond facility had rules of employee conduct, a sexual harassment policy, and a progressive discipline system. Lear's sexual harassment policy provides that "[n]o associate will suffer reprisal or retaliation as a result of reporting complaints of sexual harassment." (DE #21-2 at 5.) Under the progressive discipline system, employees who violate rules or engage in misconduct may receive a series of increasingly more severe corrective actions. In the event of sufficiently serious misconduct, Lear could skip a step in the progression and implement serious corrective action such as suspension or discharge. Upon the request of the Union, Lear could agree to repeat a step rather than moving to the next step in the progression.

On January 17, 2008, Wilson received a verbal warning for violating the rule against wasting time or loitering during work hours. Three years later, on January 19, 2011, Wilson received a verbal warning for violating the rule against making scrap, re-work or careless workmanship. Wilson received a verbal warning for the same conduct a few weeks later, on December 1, 2011. On December 21, 2011, Wilson received a verbal warning for wasting time or loitering during work hours. Wilson doesn't recall the circumstances surrounding of any of these verbal warnings.[1]

On January 27, 2012, Wilson submitted an incident report to Barbara Sacha ("Sacha"), the human resource manager at Lear's Hammond facility. In that report, Wilson accused co-worker Xavier Curtis ("Curtis") of making inappropriate sexual gestures. Sacha investigated Wilson's complaint and discharged Curtis effective February 1, 2012. Wilson was satisfied with this outcome.

Wilson testified that after Curtis was terminated, she continued to be harassed by other male co-workers. She identified

---

[1] Lear's discipline policy states that a verbal warning will remain on an employee's record for three months, but if the employee subsequently receives a written warning, both disciplines remain on the employee's record for six months, and if the employee receives a second warning, all disciplines remain on the employee's record for one year. A suspension remains on an employee's record for one year. While Wilson argues that her employment record should have reflected only those disciplines that occurred within one year of her termination on October 28, 2013, she does not dispute that she received disciplines after October 28, 2012, including suspensions.

several members of Lear management who allegedly turned a blind eye to this harassment, including supervisors Akelius Lloyd ("Lloyd"), Clint Barnard ("Barnard"), and Darryl Harper ("Harper"). Wilson recalled occasions when supervisors would walk past her work area and "just shake their heads" while co-workers were making indecent gestures. (DE #27-1 at 21.) At one point, Harper told Wilson that he would not hug her because "he would be afraid that [she] would turn him in." (*Id*. at 36.)

On February 21, 2012, Wilson received a verbal warning for wasting time or loitering during work hours. On March 12, 2012, she received a written warning for making scrap, re-work or careless workmanship. Three days later, on March 15, 2012, Wilson received a written warning for leaving her work station. Wilson does not recall the details surrounding any of these disciplines. On March 22, 2012, Wilson received a final warning for creating or contributing to an unsanitary condition, but this warning was rescinded under an agreement between Lear and the Union.

On April 27, 2012, Wilson submitted an incident report alleging that two co-workers had made inappropriate sexual gestures. Lear's assistant human resources manager Monica Holt ("Holt") and a Union representative investigated Wilson's complaint by interviewing Wilson, the two co-workers Lamontrye Edmond ("Edmond") and Keith Barrington ("Barrington"), and other

employees.[2]   None   of   the   employees   interviewed   corroborated
Wilson's  complaint.    One  employee  allegedly  stated  that  he  had
"seen male [*sic*] [and] females frown at [Wilson], because, they
say she got someone fired, some say she's crazy." (DE #21-7 at
20.)    Holt   and   the   Union   representative   provided   Edmond   and
Barrington  with  copies  of  Lear's  rules  of  personal  conduct  and
harassment   policies   "as   a   reminder   of   expected/prohibited
behavior."  (*Id*. at 8.)    They also met with Wilson to advise her
of  the  investigation  results,  and  encouraged  her  to  report  any
additional concerns.

On May 31, 2012, Wilson received a final warning for wasting
time and loitering during work hours.   On September 20, 2012, she
received  a  final  warning  for  refusing  to  adhere  to  reasonable
orders,  not  performing  job  assignment,  or  restricting  output.
Wilson  does  not  remember  the  details  of  either  of  these  final
warnings.

On September 20, 2012, Wilson submitted an incident report
alleging that she had a confrontation with two co-workers in which
a co-worker swore at her.   The two co-workers submitted incident
reports asserting that Wilson had sworn at a co-worker.   Holt and

---

[2] Lear's  human  resources  specialist  Patricia  Tarver  ("Tarver")
emailed Holt on April 27, 2012, stating that Edmonds was completing
an incident report against Wilson, asserting that "she is harassing
him.    Barb  [Sacha]  came  in  and  inquired.    GET  READY!!!!!"  (DE
#25-10.)

a Union representative investigated the incident, including interviewing Wilson, the two co-workers, another employee, and supervisor Joseph Watson ("Watson"). They were unable to corroborate Wilson's complaint. Wilson admits signing the September 20, 2012, incident report, but does not recall meeting with Holt or their investigation of the incident.

On September 26, 2012, Wilson received a final warning for threatening, intimidating, coercing, abusive language or fighting with any employee or supervisor. She does not recall the circumstances surrounding this discipline.

On October 4, 2012, Wilson submitted an incident report complaining that co-workers were harassing her by making faces and a cuckoo gesture behind her back and rubbing seats in an inappropriate manner. Wilson noted that "[e]very day since my incident with the sexual harassment case which lead to an employee being fired, I've had to indure [*sic*] mental pain [and] plain out harassment from some co-workers." (DE #21-2 at 25.) She identified Jaime Moran ("Moran") as one of the co-workers engaging in this conduct. (*Id.*) Sacha met with Wilson to discuss this complaint.

Sacha emailed Holt on October 5, 2012, stating in part that Wilson "has filed another Incident form alleging that she has had to endure mental pain every day since the termination of Xavier Curtis – as if nothing has ever occurred between 2011 and today.

I know that isn't true." (DE #25-5.)  Sacha and Holt interviewed
Moran, supervisor Watson, and a co-worker who was a potential
witness to the alleged misconduct.  Moran denied Wilson's
allegations, and Sacha and Holt found him to be credible.  Watson
and the co-worker denied witnessing the alleged misconduct.  Sacha
asked Watson "to stay on the alert to any inappropriate behavior
on the line so that he can address it." (DE #21-7 at 51.)  Sacha
and Holt met with Wilson and a Union representative to explain
that they had investigated the incident but could not substantiate
her complaint.

On January 16, 2013, Wilson was suspended for wasting time or
loitering, but the suspension was rescinded under an agreement
between Lear and the Union.  On February 9, 2013, supervisor Dave
Maple ("Maple") emailed Holt and Tarver asking that Wilson be
disciplined for wearing headphones in both ears while walking on
the production floor.  (DE #25-6 at 1.)  Assistant materials
manager Brant Johnson ("Johnson"), who had been copied on Maple's
email, responded, "[s]hould we send her for a drug test?" (*Id.*)
Maple replied, "[i]f it was up to me, yes." (*Id.*)  Holt denied
the request, stating that "[p]rogressive discipline is appropriate
in this case." (*Id.* at 2.)  On February 13, 2013, Wilson was
suspended for disregarding safety rules by wearing headphones in
both ears while walking on the production floor.  Wilson denied

doing so, and testified that Maple was lying about her wearing both headphones.

On February 21, 2013, Wilson was suspended for making scrap, re-work or careless workmanship. Wilson believes she filed a grievance with the Union about this discipline, but the Union never responded to it. On March 12, 2013, Wilson was suspended for creating or contributing to unsanitary conditions. She does not recall the circumstances surrounding this discipline. On May 9, 2013, Wilson was suspended for making scrap, re-work or careless workmanship by making defective seats. Wilson recalls being spoken to about making defective seats, and believes that that the seats were sabotaged. In all, seven different supervisors or plant superintendents, including Watson, Maple, Barnard, and Lloyd requested discipline for Wilson.[3] Several of Wilson's disciplines were issued by Lear's human resources personnel Sacha, Holt and Tarver.

On June 5, 2013, Wilson filed an EEOC Charge ("EEOC Charge") alleging:

> In January of 2012 I filed a sexual harassment complaint against my co-worker, he was discharged. I am being harassed by my Supervisor and my co-workers, making my work environment hostile to work in. On May 9, 2013, I was suspended for four days, allegedly for having 12 defective seats. My White male co-worker had defective seats also but he received no discipline. I feel this

---

[3] After Curtis was discharged, Lear hired Barnard, Lloyd, and two other supervisors who recommended discipline for Wilson. (DE #21-6 at 4.)

> is retaliation because of the incident. My male co-
> workers get behind me on the line and make inappropriate
> jesters [*sic*] behind my back and the Supervisor does
> nothing.

(DE #21-2 at 38.) Wilson identified Barnard as the supervisor and "Dave" (last name unknown to her) as the white male co-worker mentioned in the EECO Charge. (DE #27-1 at 34-35.) She testified that Dave built the allegedly defective seats in October 2013 (after she filed the EEOC Charge), and admitted that it was possible that Dave received discipline without her knowledge. (*Id.*) Wilson did not discuss the EEOC Charge with her co-workers or Lear management. Lear's production supervisors and superintendents were not informed that Lear had received the EEOC Charge.

On September 25, 2013, supervisors Barnard and Lloyd emailed Lear's new human resources assistant manager, Stacey Miller ("Miller"), about Wilson. Their emails asserted that Wilson had not completed her work on particular seats on September 24 and 25, 2013, among other issues. Miller and Lear's new human resources manager, Jose Guajardo ("Guajardo"), conducted an initial investigation. On September 30, 2013, Miller and Guajardo met with Wilson and Union representative Jamie Luna ("Luna"). Wilson insisted that she had built the seats correctly and that the seats had been sabotaged. Miller, Guajardo, Luna and Wilson met with William Bear ("Bear"), a seat repair worker. During that meeting,

Bear was repeatedly asked "if he had seen anything as far as the seats. And [Bear] said that he did not. He did not find anything." (*Id.* at 39.) Wilson noted that she was not shown a repair log reflecting the allegedly defective seats.[4] Wilson was suspended pending further investigation.

Guajardo and Miller met with Barnard, Luna and Bear outside of Wilson's presence. Bear then confirmed that on September 24, 2013, he repaired eleven seats from the zone in which Wilson was working. Miller attests that Bear "reluctant[ly]" identified Wilson as the operator. (DE #21-4 at 5 (Miller Aff. ¶11).) Guajardo and Miller found no proof of sabotage.

Guajardo and Miller found that Wilson had violated the rule against making scrap, re-work and careless workmanship. Miller attests that she and Guajardo decided to terminate Wilson's employment "because it was the next step in the progressive discipline process." (*Id.*, ¶12.) They reviewed her discipline history and saw that Wilson had been disciplined at the suspension level for the past four disciplines, rather than progressing to the next step of termination. They concluded that Lear had given Wilson multiple breaks, but her performance had not improved. They did not consult with or seek input from any superintendent or

---

[4] Lear maintains that Guajardo and Miller did not need a repair log because Lloyd's and Barnard's emails "specifically identif[ied] the seats at issue by their BSN number." (DE #28 at 8; *see* DE #21-4 at 8, 10.)

production supervisor in making the decision to terminate Wilson. Wilson's employment was terminated effective October 28, 2013.

The Union filed a grievance on Wilson's behalf. After Wilson was discharged, Lear offered Wilson a "last chance agreement," which included a release of Wilson's claims against Lear and the possibility of immediate discharge upon a future violation of certain rules of employee conduct. Wilson rejected this agreement. Lear has offered last chance agreements to other discharged employees. When Wilson filed for unemployment benefits, Lear disputed her benefits claim. Lear has disputed unemployment claims of other discharged employees who had not made internal complaints about unlawful discrimination or harassment or filed EEOC charges.

Analysis

The Complaint alleges that Lear retaliated against Wilson for engaging in the protected activity of making sexual harassment complaints about her co-worker, and filing EEOC charges alleging sex discrimination and retaliation. (DE #1, ¶38.) When attempting to establish a retaliation claim, a plaintiff may proceed under the direct or indirect methods of proof. Both methods of proof converge on the same question at issue here: "could a reasonable trier of fact infer retaliation"? *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 564 (7th Cir. 2015). To establish retaliation under the direct method, "a plaintiff must prove (1) that she engaged in statutorily protected activity; (2) that she was subjected to an

adverse employment action; and (3) that there was a causal connection between the two." *Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 485 (7th Cir. 2015) (citation omitted).[5]

Lear concedes that Wilson's January 27, 2012 internal complaint and June 5, 2013 EEOC Charge constituted protected activity. For the purpose of the instant motion, Lear assumes that Wilson's internal complaints on April 27, 2012, September 20, 2012, and October 4, 2012, also constituted protected activity. (DE #20 at 15 n.6); *see Castro*, 786 F.3d at 570 n.4 (noting that informal complaints can constitute protected activity for purposes of Title VII retaliation claim).

The Complaint alleges that Lear took adverse employment action against Wilson by: ignoring her complaints about severe and pervasive harassment by co-workers; targeting her for unwarranted and trumped-up discipline; attempting to lure Wilson into dropping her case by offering her the last chance agreement; and terminating

---

[5] Under the indirect method, an employee must show that "(1) the employee engaged in statutorily protected activity; (2) she was meeting her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity." *Majors v. General Elec. Co.*, 714 F.3d 527, 537 (7th Cir. 2013) (citation omitted). The Court need not analyze the record under the indirect method because Wilson's response brief does not raise this method, and so this argument has been waived. *See Hutt v. AbbVie Prod. LLC,* 757 F.3d 687, 694 (7th Cir. 2014). Nonetheless, such an argument would likely fail because Wilson failed to provide evidence of a similarly-situated comparator who had not engaged in protected activities and who was treated more favorably than she. *See id.*

her, after which Lear opposed her unemployment benefits claim. (DE #1, ¶39.) Lear does not dispute that Wilson's suspensions and termination constituted adverse employment action, and assumes that the verbal, written and final warnings that she received also constituted adverse employment action. (DE #20 at 16 n.7); *see Ellis v. CCA of Tennessee LLC,* 650 F.3d 640, 650 (7th Cir. 2011) (noting "suspension could qualify as an adverse employment action"); *Castro*, 786 F.3d at 564 (noting that termination is an adverse employment action). Lear challenges the allegations that it retaliated against Wilson by: (1) ignoring her complaints about harassment; (2) trying to lure her into accepting the last chance agreement; and (3) opposing her unemployment benefits claim. (DE #20 at 21-24.) Because Wilson offers no response to Lear's arguments regarding these three allegations, she effectively abandons them. *See generally Roe-Midgett v. CC Servs., Inc.*, 512 F.3d 865, 876 (7th Cir. 2008) (holding that undeveloped argument constitutes waiver); *see also Alalade v. AWS Assistance Corp.*, No. 3:09-CV-338-PPS, 2011 WL 1884339, at *2 (N.D. Ind. May 18, 2011) (finding plaintiff had abandoned a particular retaliation theory because she did not rely on it in her summary judgment briefing). Therefore, for the purpose of this motion, the Court finds that Wilson was subjected to adverse employment action when she was disciplined by being issued warnings and being suspended, and when she was discharged.

The question is whether there is a causal connection between Wilson's protected activity and the adverse employment action. Wilson relies on a "cat's paw" theory of liability to prove her retaliation claim, asserting that questions of fact remain as to whether Lear's decision-makers were "the unwitting dupes" of the "retaliatory supervisors" who sabotaged her. (DE #25 at 1; *see id.* at 7-8 (citing *Miller v. Polaris Labs., LLC,* 797 F.3d 486, 492 (7th Cir. 2015)).

> [T]he "cat's paw" theory can apply when a biased subordinate who lacks decision-making power uses the formal decision-maker as a dupe in a deliberate scheme to trigger a discriminatory employment action. Liability under that theory can be imposed where a non-decision-making employee with discriminatory animus provided factual information or input that may have affected the adverse employment action.

*Matthews v. Waukesha County,* 759 F.3d 821, 829 (7th Cir. 2014) (internal citations and quotation marks omitted); *see Miller,* 797 F.3d at 490 (noting that the cat's paw theory is premised on the ability of the culpable actor to use an innocent decision-maker as an unknowing tool of the former's animus). To create a question of fact under the "cat's paw" theory, a plaintiff must present "affirmative evidence that [somebody] improperly influenced the decision-makers." *Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1108 (7th Cir. 2012) (citation omitted). Speculation that improper influence may have existed is insufficient to carry this burden. *Id.*

In *Miller v. Polaris Laboratories*, *LLC*, Polaris fired Miller after she consistently failed to meet a processing quota. 797 F.3d at 490. Polaris argued that its decision to fire Miller was the direct consequence of her poor performance. *Id*. Miller maintained that she was set up to fail for racially discriminatory reasons because her supervisor and a coworker had tampered with her work, and the decision-makers were unaware that her ability to meet her quota had been sabotaged. *Id*. The Seventh Circuit found that Miller had shown a dispute of fact regarding whether her supervisor and coworker were motivated by racial animus based on evidence that they had made racially derogatory comments about Miller. *Id*. at 491. The Seventh Circuit also found that an issue of fact existed regarding whether the supervisor and coworker took actions that proximately caused Miller's termination based on evidence that the supervisor and coworker had been seen sabotaging Miller's work on multiple occasions. Although Polaris had some evidence that Miller's work could not have been manipulated to the extent that she claimed, the Court found that this evidence "[wa]s not ironclad." *Id*. at 492.

Here, Wilson maintains that Lear's human resources department issued disciplines with little or no scrutiny based upon a

supervisor's request.[6]  Similar to the plaintiff in *Miller*, Wilson

asserts that genuine issues of material fact exist as to whether

her supervisors harbored retaliatory animus against her for

getting Curtis fired, and whether the supervisors turned a blind

eye to other co-workers' harassment of Wilson.  In support, Wilson

asserts that she was written up twelve times in the sixteen months

after she made the sexual harassment complaint against Curtis in

January 2012, four of which occurred in the two months after making

the complaint.[7]  The Court notes that Wilson also received three

verbal warnings in 2011, before she complained about Curtis.

"Suspicious timing alone rarely establishes causation, but if

there is corroborating evidence that supports an inference of

causation, suspicious timing may permit a plaintiff to survive

summary judgment."  *Sklyarsky v. Means-Knaus Partners, L.P.,* 777

F.3d 892, 898 (7th Cir. 2015).

Wilson relies upon three statements by supervisors as

evidence that Lear management had a negative attitude toward her:

(1) supervisor Harper's alleged statement that he would not hug

Wilson for fear she would turn him in; (2) manager Johnson's

suggestion that Wilson take a drug test in response to supervisor

---

[6]The human resources department personnel included Sacha, Holt and
Tarver, who issued disciplines to Wilson in 2012 and 2013, and
Guajardo and Miller, who discharged Wilson in October 2013.

[7]Wilson acknowledges that the March 22, 2012 write-up and January
16, 2013 suspension were rescinded.

Maple's email requesting Wilson's discipline in February 2013; and (3) Maple's emailed statement, "[i]f it was up to me, yes," in response to Johnson's suggestion that Wilson take a drug test. (DE #27-1 at 36; DE #25-6.) Wilson offers no evidence that Harper, Johnson or Maple had a role in the decision to discharge her. Therefore, a trier of fact could not find that any of them influenced that decision. *See Castro*, 786 F.3d at 568 (holding that a reasonable trier of fact could not find that a supervisor influenced termination decisions where there was no evidence that he had any input in the decisions to terminate plaintiffs). Nor does Wilson offer evidence that Harper or Johnson influenced Lear's decisions to discipline her. While Harper's alleged statement could be interpreted as referring to Wilson's sexual harassment complaint, "stray remarks that are neither proximate nor related to the employment decision are insufficient to defeat summary judgment." *Sun v. Bd. of Trustees of Univ. of Ill.*, 473 F.3d 799, 813 (7th Cir. 2007) (citation omitted). Wilson does not offer any evidence that his remark was related to any discipline, or that Harper recommended discipline or otherwise "exercised a significant degree of influence" over any decision to discipline her. *Id*. (citation omitted). As for Johnson, Wilson offers no evidence that he harbored any retaliatory animus toward her, or that he recommended any discipline for her. To the extent that Johnson's suggestion that Wilson take a drug test could be

considered an attempt to exercise influence over Lear's decision, the attempt was unsuccessful because Holt declined the suggestion.

Although Maple recommended Wilson's February 13, 2013 discipline, Wilson offers no evidence that Maple harbored retaliatory animus toward her for filing internal complaints or EEOC charges. Maple's email recommending discipline does not reference Wilson's protected activity, and Wilson testified that she "never had any issues with [Maple]." (DE# 27-1 at 29.) "[P]laintiffs must produce evidence that a retaliatory motive *actually* influenced the decision-maker, not merely that it *could* have." *Brown,* 700 F.3d at 1108 (emphasis in original).

Wilson does not assert that Barnard and Lloyd – the supervisors who provided the information that led to her discharge – made derogatory statements about her sexual harassment complaints. Wilson points to no evidence suggesting that Barnard or Lloyd harbored retaliatory animus against Wilson for submitting internal complaints of sexual harassment, or that they (or any other supervisors) were even aware of her EEOC Charge. The Court is "not required to draw inferences that, are supported by only speculation [or] conjecture." *Simpson v. Beaver Dam Cmty. Hosps., Inc.*, 780 F.3d 784, 798 (7th Cir. 2015) (citation and internal quotation marks omitted).

Wilson cites two emails between Lear's human resources personnel as demonstrating their frustration with Wilson's issues

with other co-workers.  On April 27, 2012, Tarver emailed Holt, relaying co-worker Edmonds' complaint that Wilson was harassing him, and suggesting that Holt "GET READY!"  (DE #25-10.)  On October 5, 2012, Sacha emailed Holt to relay Wilson's complaint "that she has had to endure mental pain every day since the termination of Xavier Curtis – as if nothing has ever occurred between 2011 and today.  I know that isn't true."  (DE #25-5.) Considered in the light most favorable to Wilson, these emails indicate that Lear's human resources personnel knew that a co-worker had a conflict with Wilson in April 2012, and that they questioned the credibility of Wilson's October 2012 harassment complaint.  However, the undisputed evidence shows that Lear investigated these complaints, including interviewing the parties involved and possible witnesses.  Wilson does not question the efficacy of these investigations.  Moreover, she offers no evidence that Tarver or Sacha recommended any discipline for Wilson, or had any role in her discharge.  For these reasons, Wilson has failed to submit evidence from which a reasonable trier of fact could conclude that she was disciplined and discharged in retaliation for filing internal sexual harassment complaints or EEOC charges.

Even if Wilson had evidence of a retaliatory motive, Lear may show that Wilson would have been discharged even absent her complaints about harassment.  *See Lord v. High Voltage Software, Inc.,* 839 F.3d 556, 564 (7th Cir. 2016), *cert. denied,* 137 S. Ct.

1115, 197 L. Ed. 2d 185 (2017). Where an employer can make such a showing, then the alleged retaliatory motive was not "a but-for cause of [the employee's] harm." *Id.* (citation omitted). An employee can avoid summary judgment by showing that a material factual dispute exists on the question of pretext.

> To show pretext, an employee must present evidence suggesting that the employer is dissembling. The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge. To meet this burden, the employee must identify such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered reason that a reasonable person could find [it] unworthy of credence.

*Castro*, 786 F.3d at 565 (internal citations and quotation marks omitted); *see O'Leary v. Accretive Health, Inc.,* 657 F.3d 625, 635 (7th Cir. 2011) ("It is not the court's concern that an employer may be wrong about its employee's performance, or may be too hard on its employee. Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie.") (citation and internal quotation marks omitted).

Here, Lear meets the burden of presenting a legitimate, nondiscriminatory reason for its employment actions by providing evidence that it disciplined and discharged Wilson for repeatedly violating company rules. "Inconsistent performance – though not uniformly bad – is a legitimate, non-retaliatory reason for termination." *Castro*, 786 F.3d at 580 (citation omitted). Lear's

decisions to discipline Wilson were based on seven different supervisors' assertions that Wilson violated various rules of employee conduct. Its decision to discharge Wilson was based on Guajardo and Miller's investigation of two supervisors' allegations that Wilson violated rules by building seats improperly in September 2013. Because Lear offers legitimate, nondiscriminatory reasons for disciplining and discharging Wilson, the burden shifts to Wilson to demonstrate that Lear's proffered reasons are a pretext for retaliatory intent.

Wilson cannot recall the details of most of the disciplines she received. She contends that genuine issues of material fact exist as to two events: whether she violated Lear's rule against wearing two headphones in February 2013, and whether she improperly built seats in September 2013. Wilson maintains that Bear made conflicting statements regarding whether she improperly built seats in September 2013. When questioned in Wilson's presence, Bear allegedly said that he did not see "anything" regarding the defective seats (DE #27-1 at 39), but later "reluctant[ly]" told Miller that Wilson was the operator in the zone producing the defective seats (DE #21-4 at 5 (Miller Aff. ¶11). Wilson argues that Bear's statement to Miller is inadmissible hearsay because it is offered to prove the truth of the matter asserted. But Bear's statement to Miller is not hearsay because Lear does not offer this evidence as proof of the truth of that statement. Rather, it

is offered to prove that Guajardo and Miller conducted an investigation of Barnard's and Lloyd's allegations and decided to discharge Wilson for reasons other than her sexual harassment complaints. *See Boutros v. Avis Rent A Car Sys., LLC,* 802 F.3d 918, 924 (7th Cir. 2015) (holding that out-of-court statements "presented not for their truth but as evidence of Avis's reasons for suspending and then firing" the plaintiff to be "clearly probative" as to whether Avis fired the plaintiff for nondiscriminatory reasons); *Smith v. Wilson*, 705 F.3d 674, 679 (7th Cir. 2013) (statements were not hearsay where "they were offered not to prove the truth of the matter asserted . . . but rather for the non-hearsay purpose of explaining Wilson's subsequent actions"). This evidence also goes to demonstrate Guajardo and Miller's honest belief that Wilson improperly built the seats. *See Pugh v. City of Attica*, *Ind.,* 259 F.3d 619, 627 n.7 (7th Cir. 2001) (holding that an out-of-court statement offered to prove employer's honest belief that plaintiff had misappropriated funds was not hearsay); *Brill v. Lante Corp.,* 119 F.3d 1266, 1271 (7th Cir. 1997) (holding that out-of-court statements concerning an employee's performance problems were not hearsay because they went to the issue of the employer's "honest belief" concerning such problems).

Moreover, where "the employer contends that the plaintiff's job performance was wanting, the plaintiff must do more than

dispute the validity of the employer's criticisms." *O'Leary,* 657 F.3d at 635. "The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered" to explain the adverse employment action. *Id.* Wilson proffers no evidence suggesting that Lear's decision-makers did not believe that Wilson had violated the rules of employee conduct when deciding to discipline and discharge her.

Wilson also contends that questions of fact exist as to whether supervisor Maple fabricated allegations that she violated the headphone rule in February 2013, whether supervisors Barnard and Lloyd fabricated allegations that she improperly built seats in September 2013, and why they would do so. Wilson relies on her own testimony that these supervisors were lying about her violating rules of employee conduct. But even assuming that the supervisors had lied, Wilson proffers no evidence that any of them recommended discipline for her in retaliation for her sexual harassment complaints. Because Wilson proffers no evidence of retaliatory animus, she fails to raise a genuine issue of material fact as to whether Lear's reasons for disciplining and discharging her were pretextual. Therefore, the Court **GRANTS** summary judgment on Wilson's retaliation claim.

CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment (DE #19) is **GRANTED,** and Defendant's Motion to Strike (DE #29) is **GRANTED.** Accordingly, this case is **DISMISSED** with prejudice and the Clerk is **DIRECTED** to **CLOSE** this case.


**DATED:  June 14, 2017**                    **/s/RUDY LOZANO, Judge**
                                             **United States District Court**